239 N.J. Super. 285 (1990)
571 A.2d 305
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RONALD TURCOTTE AND LISE TURCOTTE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1989.
Decided March 8, 1990.
*287 Before Judges O'BRIEN, HAVEY and STERN.
Michael D. Schottland argued the cause for appellants (Chamlin, Schottland, Rosen, Cavanagh & Uliano, attorneys; Michael D. Schottland on the brief).
Patricia Bowen Quelch, Assistant Prosecutor, argued the cause for respondent (John Kaye, Monmouth County Prosecutor, attorney; Mark P. Stalford, Assistant Prosecutor, of counsel and on the brief).
*288 The opinion of the court was delivered by HAVEY, J.A.D.
The principal issue raised by this appeal is whether a warrantless administrative search of an off-track stable housing licensed harness racing horses, pursuant to N.J.A.C. 13:71-23.5, violates the Fourth Amendment to the United States Constitution. In State v. Dolce, 178 N.J. Super. 275, 428 A.2d 947 (App.Div. 1981), we held that an essentially identical regulation controlling thoroughbred racing did not violate the Fourth Amendment because horse racing in New Jersey fell within "pervasive and long-standing government regulation exceptions to the administrative search warrant rule[.]" Id. at 285, 428 A.2d 947. Defendants now contend that our holding in Dolce should be "reviewed" in light of New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). We conclude that N.J.A.C. 13:71-23.5 satisfies the Burger three-pronged test and hence does not violate the Fourth Amendment.
Defendants husband and wife, Ronald and Lise Turcotte, were convicted in the Manalapan Township Municipal Court, and again after their trial de novo in the Law Division, of possession of prescription legend drugs without a prescription, N.J.S.A. 2A:170-77.8, and possession of hypodermic needles and syringes without a prescription, N.J.S.A. 24:21-51. On their conviction they were fined $300 and $120 respectively and were assessed court costs.
On appeal, defendants argue that N.J.A.C. 13:71-23.5 violates the Fourth Amendment and therefore their motion to suppress should have been granted. They also argue that the evidence seized should have been suppressed because the State failed to show that the state steward's memorandum authorizing the search was based on written notice from the official chemist. See ibid. Defendants also challenge their convictions for possessing prescription legend drugs because the contents of the containers seized were never analyzed by the state chemist. They further assert that their convictions for unlawful possession of hypodermic syringes and needles were against the *289 weight of the evidence, and in particular that the State failed to show that defendant Lise Turcotte was in either actual or constructive possession of the physical evidence seized.
At the suppression hearing, State Police Detective Steven Makuka testified that the horse "Trottin' Happy," the second-place finisher in a race at the Freehold Raceway on October 15, 1986, tested positively for the drug Dipyrone in a test performed by the State Police Equine Testing Unit immediately following the race. Lise Turcotte was the trainer of Trottin' Happy and Ronald Turcotte was a part owner. Mr. Turcotte is also a licensed trainer and uses his Manalapan Township residence as his training facility.
As a result of the positive test, the sample was forwarded to the State Police laboratory at the Meadowlands Racetrack for confirmatory testing. The results of the positive analysis were transmitted to the Racing Commission and, on October 17, 1986, State Steward O'Donnell issued a memorandum authorizing "a search of the premises occupied by Ron and Lis[e] Turcotte stable or trainer." The search was authorized pursuant to N.J.A.C. 13:71-23.5(a), which provides in pertinent part:
On receiving written notice from the official chemist that a specimen has been found "positive" for any drug or substance foreign to the natural horse, the steward shall proceed as follows:
1. He or she shall notify the State Police and authorize a search of the premises occupied by the stable involved.
2. He or she shall, as quickly as possible, notify the owner and trainer of the horse involved.
After Detective Makuka received the report and memorandum on October 18, 1986, he went to the Turcotte training facilities and met Mr. Turcotte outside his barn. The detective identified himself, told Mr. Turcotte of the positive test results, showed him the state steward's memorandum and advised him of the authorization to search. The detective explained to Mr. Turcotte that the document was "not a search warrant but an administrative directive to the state police to conduct a search of his premises." Mr. Turcotte thereupon permitted a search of the barn, tack boxes and Trottin' Happy's stall. A search of a *290 refrigerator in the barn storage room revealed prescription drugs, hypodermic needles and syringes, which were seized by the detective. The Turcotte home was not searched.
In an affidavit in support of defendants' motion to suppress, Mr. Turcotte stated that his farm is not licensed by the Racing Commission, nor is it a public training facility. He explained that he did "not exclusively raise or care for race horses" and did not rent stall space to any other horseman. He stated "I am the only horseman on my premises."
In denying the suppression motion, the Law Division judge, citing Dolce, concluded that the search of defendants' premises was a valid administrative search, and thus did not violate the Fourth Amendment. He reasoned that the regulation, "on its face," does not distinguish between on-track and off-track premises and "plainly" authorized the search of defendants' off-track stable area. Defendants' motion for reconsideration was also denied.
We held in Dolce, that a regulation essentially identical to N.J.A.C. 13:71-23.5 was constitutional and authorized police officials to search stable areas occupied by Dolce at the Monmouth Park Raceway. 178 N.J. Super. at 287, 428 A.2d 947. In so holding, we relied on the recognized exception to the search warrant requirement involving administrative activities within various industries subject to "pervasive or long-standing governmental regulation." Id. at 283, 428 A.2d 947. Noting the establishment of the Racing Commission, its pervasive regulatory control over all aspects of horse racing in the State, N.J.S.A. 5:5-22, as well as its broad rule-making powers to carry out the Legislature's mandate, N.J.S.A. 5:5-30, we concluded that "horse racing in this State fits under both the pervasive and long-standing government regulation exceptions to the administrative search warrant rule[.]" Dolce, supra, 178 N.J. Super. at 285, 428 A.2d 947. See also Delguidice v. New Jersey Racing Com'n, 100 N.J. 79, 90, 494 A.2d 1007 (1985). New Jersey has applied this administrative search exception in *291 other closely regulated industries. See In re Martin, 90 N.J. 295, 312, 447 A.2d 1290 (1982) (casino employees while on casino premises); State v. Williams, 84 N.J. 217, 223, 417 A.2d 1046 (1980) (liquor industry); State v. Rednor, 203 N.J. Super. 503, 507, 497 A.2d 544 (App.Div. 1985) (pharamaceutical industry); In re Environmental Protection Dep't., 177 N.J. Super. 304, 313, 426 A.2d 534 (App.Div. 1981) (wastewater treatment facilities); State v. Bonaccurso, 227 N.J. Super. 159, 545 A.2d 853 (Law Div. 1988) (disposal of meat by-products within meat packing industry).
Defendant argues that the holding in Dolce should be reconsidered in light of the United States Supreme Court's decision in New York v. Burger, supra, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601. Burger involved the search of a state regulated junkyard in Brooklyn, New York. Police officers entered Burger's junkyard to conduct an inspection pursuant to N.Y.Veh. & Traf. Law, § 415-a5 (McKinney 1986). Id. at 694, 107 S.Ct. at 2639, 96 L.Ed.2d at 608. The inspection revealed stolen vehicles and parts and Burger was arrested for possession of stolen property. Id. at 695, 107 S.Ct. at 2640, 96 L.Ed.2d at 609. Burger challenged § 415-a5, arguing that the warrantless administrative inspection of his business premises violated the Fourth Amendment. Id. at 696, 107 S.Ct. at 2640, 96 L.Ed.2d at 610.
Burger recognized that the Fourth Amendment's "prohibition on unreasonable searches and seizures is applicable to commercial premises as well as to private homes." Id. at 699, 107 S.Ct. at 2642, 96 L.Ed.2d at 612. See also See v. City of Seattle, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943, 946 (1967). However, while the commercial property owner has an expectation of privacy, that expectation "is particularly attenuated" in "closely regulated" industries. Burger, supra, 482 U.S. at 700, 107 S.Ct. at 2642-43, 96 L.Ed.2d at 612, quoting Colonnade Catering Corp. v. United States, 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970), and see United States v. Biswell, 406 *292 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). The court recalled its observation made in Biswell:
When a [gun] dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection. [Burger, supra, 482 U.S. at 701, 107 S.Ct. at 2643, 96 L.Ed.2d at 613, quoting Biswell, supra, 406 U.S. at 316, 92 S.Ct. at 1596, 32 L.Ed.2d at 92-93].
Burger recognized that the warrant and probable cause requirements, "which fulfill the traditional Fourth Amendment standard of reasonableness for a government search," have lessened application in the context of the inspection or search of a "closely regulated" industry. Burger, supra, 482 U.S. at 702, 107 S.Ct. at 2643-44, 96 L.Ed.2d at 613. However, the court set forth three criteria that must be satisfied before a warrantless inspection of a "closely regulated" business will be deemed reasonable. First, there must be a "`substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." Id. at 702, 107 S.Ct. at 2644, 96 L.Ed.2d at 614. For example, the regulation of firearms is "of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders[.]" Ibid, quoting United States v. Biswell, supra, 406 U.S. at 315, 92 S.Ct. at 1596, 32 L.Ed.2d at 92; see also Colonnade Catering Corp., supra, 397 U.S. at 75, 90 S.Ct. at 776, 25 L.Ed.2d at 64 (federal interest "in protecting the revenue against various types of fraud").
Second, the warrantless inspection must be "necessary to further [the] regulatory scheme." Burger, supra, 482 U.S. at 702, 107 S.Ct. at 2644, 96 L.Ed.2d at 614, quoting Donovan v. Dewey, 452 U.S. 594, 600, 101 S.Ct. 2534, 2538-39, 69 L.Ed.2d 262, 270 (1981). The court in Donovan, for example, recognized that forcing inspectors to obtain a warrant before inspection of mines might alert owners and operators of the impending inspection, thereby frustrating the purposes of the Mine Safety and Health Act. 452 U.S. at 603, 101 S.Ct. at 2540, 69 L.Ed.2d at 271-272.
*293 Third, the regulatory inspection "in terms of the certainty and regularity of its application," must provide a constitutionally adequate substitute for a warrant. Burger, supra, 482 U.S. at 703, 107 S.Ct. at 2644, 96 L.Ed.2d at 614. Thus, it must first advise the owner that the search is being made pursuant to the law. Ibid. In other words, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Ibid., quoting Donovan, supra, 452 U.S. at 600, 101 S.Ct. at 2539, 69 L.Ed.2d at 270.
The regulatory statute must also have a "properly defined scope, and it must limit the discretion of the inspecting officers"; that is, it must be "carefully limited in time, place and scope." Burger, supra, 482 U.S. at 703, 107 S.Ct. at 2644, 96 L.Ed.2d at 614, quoting Biswell, supra, 406 U.S. at 315, 92 S.Ct. at 1596, 32 L.Ed.2d at 92. In this regard, Professor LaFave has observed "It will be important, for example, that the statute only authorizes inspection during business hours, or, if the statute itself is not so limited, that the inspecting agency has clearly adopted such a policy." 3 LaFave, Search & Seizures § 10.2(f) at 659-660 (2d Ed. 1987). Also, proper limitation in scope may be accomplished by stating in the regulation the limited purpose of the search and precisely what things may be examined. Id. at 660. Such statements "might be taken to convey to the inspector an understanding as to where he should look in order to accomplish those purposes." Id. at 660-661.
Burger concluded that if the three-pronged test is satisfied, the administrative search is reasonable and "[t]he discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect." 482 U.S. at 716, 107 S.Ct. at 2651, 96 L.Ed.2d at 622-623.
*294 Applying the Burger three-pronged test here, we are satisfied that N.J.A.C. 13:71-23.5, and the search of defendants' stable area conducted thereunder, did not violate the Fourth Amendment. As we stated in Dolce, there is no question that the racing industry in New Jersey is subject to pervasive and long-standing government regulation. 178 N.J. Super. at 285, 428 A.2d 947. Thus, a horseman licensed under Commission regulations has a reduced expectation of privacy in this "closely regulated" industry. Burger, supra, 482 U.S. at 700, 107 S.Ct. at 2642-43, 96 L.Ed.2d at 612. There is also no question that New Jersey has a substantial interest in regulating owners, horsemen and licensed premises in order to preserve the integrity of horse racing and parimutuel wagering. Delguidice, supra, 100 N.J. at 90, 494 A.2d 1007; Maietta v. N.J. Racing Com'n., 93 N.J. 1, 7, 459 A.2d 295 (1983); Shoemaker v. Handel, 795 F.2d 1136, 1142 (3rd Cir.1986), cert. den. 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). Defendants therefore concede that the regulation meets the first prong of the Burger test.
However, defendants argue that N.J.A.C. 13:71-23.5 fails to satisfy Burger's second prong, that the regulation is "necessary to further [the] regulatory scheme." 482 U.S. at 702, 107 S.Ct. at 2644, 96 L.Ed.2d at 614. They reason that the state police are able to obtain a warrant from a "detached magistrate" between the time the police are notified by the steward of the positive test and the time the search is conducted.
Defendants ignore the evident purpose of the regulation: to serve as an effective deterrent by placing licensees on notice that their stable shall be subject to unannounced searches in the event of post-race positive testing. See Biswell, supra, 406 U.S. at 316, 92 S.Ct. at 1596, 32 L.Ed.2d at 92. Achievement of this important goal requires the element of surprise. "[T]he prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope and frequency is to be preserved, the protections afforded by a warrant would be negligible." Ibid.
*295 While the owner or trainer may know that his horse has been tested, he does not know that the test was positive and hence would have no reason to destroy or hide the offending drug. The need for intervention by a "detached magistrate" is minimized since probable cause to believe the horseman has been involved in drugging the horse has already been established by the equine testing procedure. N.J.A.C. 13:71-23.5 provides a prompt and effective mechanism to seize the drug and other related material without notice to the violator. Hence, the regulation reasonably serves the State's substantial interest in eradicating the unlawful use of drugs in horse racing. See Shoemaker, supra, 795 F.2d at 1142.
Defendants also argue that the third prong of the Burger test is not satisfied. They claim that N.J.A.C. 13:71-23.5 is unclear as to whether it applies to off-track stable areas as well as stables at the race track. They also assert that since they are a non-licensed "mom and pop" operation, it is not sufficiently clear that their stable will be subject to searches pursuant to the regulation.
We held in Dolce that the pertinent regulation "plainly and simply authorizes a search `of the premises occupied by the stable involved'[,]" and that "[t]here is no difference between the classes of persons stabled at the track and those stabled elsewhere." 178 N.J. Super. at 285, 428 A.2d 947. We concluded that nothing in the regulations suggests that off-track racing stables are immune from the administrative search authorized by the regulation. Id. at 285-286, 428 A.2d 947. Moreover, N.J.A.C. 13:71-7.26(a) provides:
No horse may start in any race ... unless stabled on the grounds of a racing association ... or at a farm or training facility licensed by the Commission. [Emphasis added].
Subparagraph (c) provides:
Any farm or training center making application for licensure as an off-track stabling facility shall be liable to inspection by the employees of the Commission and shall be required to provide unrestricted access to all stabling facilities to the employees and agents of the Commission upon demand. [Emphasis added].
*296 There can be no question that this regulation, read in conjunction with N.J.A.C. 13:71-23.5, places owners and trainers on notice that their off-track, as well as on-track facilities, are subject to a search, and that the search "is being made pursuant to the law[.]" Burger, supra, 482 U.S. at 703, 107 S.Ct. at 2644, 96 L.Ed.2d at 614.
That defendants' "mom and pop" farm may not be licensed is of no moment. All owners and trainers are subject to the laws of the State and rules promulgated by the Racing Commission. See N.J.A.C. 13:71-1.2. Every owner and trainer must be licensed. N.J.A.C. 13:71-7.1; 13:71-7.27; 13:71-7.30. Trainers are declared the "absolute insurer[s]" of the condition of the horse, and trainers and owners are charged with the responsibility of protecting and guarding the horse against the administration of any drug or substance. N.J.A.C. 13:71-23.6(a) and (d). As stated, no horse may start in any race unless stabled at the track "or at a farm or training facility licensed by the Commission." N.J.A.C. 13:71-7.26(a). Hence, all owners and trainers who race a horse under the Commission's jurisdiction are embraced by the regulatory scheme. Defendants' choice in not securing a license for the farm does not exempt them from the reach of the regulatory search. See Bonaccurso, supra, 227 N.J. Super. at 169, 545 A.2d 853. Were it otherwise, horsemen could frustrate the regulatory purpose of the search by simply removing the horse to a nonlicensed location.
Finally, we reject defendants' argument that N.J.A.C. 13:71-23.5 fails to limit the discretion of the searching officer. A search pursuant to the regulation is not made at the unbridled discretion of the state steward or the officer executing the search. See Shoemaker, supra, 795 F.2d at 1143. It is conducted only after a horse tests positively after a race. The owner or trainer subject to the search is not left to wonder about the purpose of the search, since he is charged with knowledge of the regulations and is told about the positive test *297 when the search is conducted. See Biswell, supra, 406 U.S. at 316, 92 S.Ct. at 1596, 32 L.Ed.2d at 92-93.
Further, the regulation expressly limits the search to the "premises occupied by the stable involved[,]" and N.J.A.C. 13:71-7.26(c) places the horseman on notice that any farm applying for licensure as an "off-track stabling facility" shall be subject to inspection upon demand. A fair reading of these regulations would lead a reasonable inspecting officer to conclude that the search shall be limited to the stable area, stalls, barn and related facilities. Moreover, the Racing Commission has adopted a policy that searches shall be limited, pursuant to Dolce, to the stalls, barns, sheds, horse trailers and other equipment located in the immediate stable area. See 3 LaFave, supra, at 660. Finally, Detective Makuka, assigned and trained to carry out the equine testing procedure, was more qualified to understand and adhere to the stated scope limitations of the regulations than other law enforcement officers. See id. at 660-661.
While the regulation does not set forth the hours within which the inspection shall be conducted, it may be implied from it that the searches are to be conducted at a reasonable time. See Biswell, supra, 406 U.S. at 315, 92 S.Ct. at 1596, 32 L.Ed. at 92; State v. Bonaccurso, supra, 227 N.J. Super. at 170, 545 A.2d 853. Also, there can be no question from a fair reading of the regulations that the search shall be limited to drugs or substances foreign to the horse, paraphernalia and related materials. We are therefore satisfied that N.J.A.C. 13:71-23.5 satisfies the Burger criteria and therefore does not violate the Fourth Amendment to the United States Constitution.[1]
*298 We reject defendants' argument that, even if N.J.A.C. 13:71-23.5 is constitutional, the warrantless search here violated their rights. The proofs do not support defendants' assertion that Detective Makuka had "unbridled discretion" and proceeded with a "blank check" during the course of the search. The detective knew he was searching only for "any drug and/or substance foreign to the natural horse[.]" N.J.A.C. 13:71-23.1. He confined the search to the stable and barn area and did not search defendants' home. The search was conducted during business hours and only after the detective advised defendant as to the reason and purpose for the search. While searching for the drug administered to the horse, the detective, when he opened the refrigerator as part of the administrative search, observed the prescription legend drugs and paraphernalia in plain view. Thus, the drugs and paraphernalia were properly seized and held admissible under the plain view doctrine. See State v. Bruzzese, 94 N.J. 210, 235-236, 463 A.2d 320 (1983), cert. den. 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984).[2]
*299 Defendants also argue that the evidence seized should have been suppressed because the State failed to produce the official chemist's written notice of a positive test result that triggered the state steward's authority for a search under N.J.A.C. 13:71-23.5.
The State's purported failure to obtain a written notice from the chemist was not raised during the suppression hearing. Indeed, defense counsel stated he had no objection to admission of the steward's memorandum authorizing the search, and the Law Division judge made his findings assuming that the fact was not in dispute. The sufficiency of the proofs to support the authorization for the search having been voluntarily admitted, satisfies us that defendants waived their right to now challenge it. See State v. Wright, 113 N.J. Super. 79, 81, 272 A.2d 758 (App.Div. 1971), certif. den. 58 N.J. 164, 275 A.2d 745 (1971); and see State v. DiRienzo, 53 N.J. 360, 384, 251 A.2d 99 (1969).
Further, R. 3:5-7 contemplates a "full airing of the evidence" during the suppression hearing, and we may only consider whether the motion to suppress was properly decided based on the evidence presented at that time. State v. Jordan, 115 N.J. Super. 73, 76, 278 A.2d 223 (App.Div. 1971), certif. den. 59 N.J. 293, 281 A.2d 806 (1971); see also State v. Clarke, 198 N.J. Super. 219, 228, 486 A.2d 935 (App.Div. 1985). Based on the suppression hearing record, we must assume, as did the Law Division judge, that the procedural requirements of N.J.A.C. 13:71-23.5 had been satisfied.
*300 Aside from the suppression issue, defendants raise an array of challenges, also raised below, to their convictions. The Law Division judge did not address these contentions. Essentially, the finding of guilt after the trial de novo was made without any findings at all. The judge's two letter opinions addressed only the suppression issues. Because our role is to decide whether a trial judge's findings after a trial de novo are supported by sufficient credible evidence, see State v. Johnson, 42 N.J. 146, 161-162, 199 A.2d 809 (1964), we deem it necessary to remand for thorough fact-finding by the Law Division as to these issues and the ultimate question of guilt or innocence as to each defendant. See R. 3:23-8. At oral argument, both the prosecutor and defense counsel agreed that such a remand is necessary in order for counsel to address the issues.
The order denying defendants' motion to suppress is affirmed. Otherwise, we remand to the Law Division for additional fact-finding.
NOTES
[1] Defendants have not raised the argument that N.J.A.C. 13:71-23.5(a) violates the New Jersey Constitution. We acknowledge that in other contexts the New Jersey Supreme Court has held that state constitutional protections may exceed that provided under the federal constitution. See State v. Mollica, 114 N.J. 329, 352, 554 A.2d 1315 (1989); State v. Gerald, 113 N.J. 40, 76, 549 A.2d 792 (1988). This is particularly true with respect to a citizen's right to be free from unreasonable searches and seizures under N.J. Const. (1947), Art. I, par. 7. See State v. Novembrino, 105 N.J. 95, 145, 519 A.2d 820 (1987).

However, it is equally settled that such enhanced protections under the state constitution should be extended only when justified by "[s]ound policy reasons." State v. Stever, 107 N.J. 543, 557, 527 A.2d 408 (1987), cert. den. 484 U.S. 954, 108 S.Ct. 348, 98 L.Ed.2d 373 (1987), quoting State v. Hunt, 91 N.J. 338, 345, 450 A.2d 952 (1982). Here, "[s]ound policy reasons" do not compel a departure from the warrantless administrative search exception to the Fourth Amendment. To the contrary, as earlier stated, our Legislature has declared a strong state policy favoring close scrutiny and control over horse racing and parimutuel betting. The warrantless search is an integral and essential component of the regulatory scheme, and may be conducted with minimal intrusion upon the privacy rights of the regulated industry.
[2] This is not a case where the regulatory agency, conducting an administrative search, finds the violation but thereafter expands its search seeking the fruits of a crime. Once an administrative search has accomplished its purpose, its validity ends. See Michigan v. Clifford, 464 U.S. 287, 294, 104 S.Ct. 641, 647, 78 L.Ed.2d 477, 484-485 (1984). A valid administrative search cannot be used as a pretext for a search for criminal evidence. Ibid; see also Reich, "Administrative Searches for Evidence of Crime: The Impact of New York v. Burger," 5 Touro L.Rev. 31, 41 (1988). Here, the illegal drugs and paraphernalia were observed in plain view while Detective Makuka was still searching for the drug found in defendants' horse. In any event, we do not suggest that the drugs and paraphernalia could not have been lawfully seized within the ambit of the administrative search even if not in plain view.