265 N.J. Super. 370 (1993)
627 A.2d 667
PATRICIA DESILETS ON BEHALF OF AND AS NATURAL GUARDIAN OF BRIEN DESILETS, PLAINTIFF-APPELLANT,
v.
CLEARVIEW REGIONAL BOARD OF EDUCATION, MICHAEL P. TOSCANO, SUPERINTENDENT, AND CHARLES BISHOP, PRINCIPAL, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1993.
Decided June 16, 1993.
*372 Before Judges LONG, D'ANNUNZIO and KEEFE.
William H. Buckman argued the cause for appellant (American Civil Liberties Union of New Jersey, attorney).
Robert A. Muccilli argued the cause for respondents (Capehart & Scatchard, attorneys).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
The issue is whether defendants violated the Fourth Amendment by searching students' hand luggage prior to a field trip. After a bench trial, the trial court entered a judgment for defendants on this issue.[1] We now affirm.
Brien Desilets entered Clearview Junior High School in September 1987 as an eleven year old seventh grader. In June 1990, the school planned a field trip to a picnic and campground. The trip was voluntary and recreational. Transportation was by bus provided by the school board. Teachers were to accompany the students and function as chaperones.
Because the trip was off school premises, the school administrators required parental permission. Permission slips were given to the students, to be signed by a parent. Brien's mother signed his slip which contained a statement that hand luggage would be searched. Brien's mother testified that she read the search notice before signing the document.
*373 On the day of the field trip, Brien's gym bag and food cooler were searched before he boarded the bus. No contraband or other items deemed to be inappropriate were found. The hand luggage of all other students boarding the bus was searched.
Mr. Toscano, a defendant and the superintendent of the school system, testified that the board's policy was to search only hand luggage prior to field trips to discover any alcohol, weapons or drugs. The school did not search students' persons or pockets.
The Fourth Amendment protects students from unreasonable searches and seizures by school officials. New Jersey v. T.L.O., 469 U.S. 325, 336-37, 105 S.Ct. 733, 739-40, 83 L.Ed.2d 720, 731 (1985) (hereinafter T.L.O.). "A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." Id. at 337-38, 105 S.Ct. at 740-41, 83 L.Ed.2d at 732.[2] However, the child's interest in privacy must be balanced against "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." Id. at 339, 105 S.Ct. at 741, 83 L.Ed.2d at 733. Anticipating the accelerating violence and disorder in some school settings, the Court observed:
Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. See generally 1 NIE, U.S. Dept. of Health, Education and Welfare, Violent Schools  Safe Schools: The Safe School Study Report to the Congress (1978). Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. "Events calling for discipline are frequent occurrences and sometimes require immediate, effective action." Goss v. Lopez, 419 U.S. [565] at 580, 95 S.Ct. 729 [739, 42 L.Ed.2d 725]. Accordingly, we have recognized that maintaining security and order in the schools requires a certain *374 degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship. See id., at 582-583, 95 S.Ct. 729 [740-741, 42 L.Ed.2d 725;] Ingraham v. Wright, 430 U.S. [651] at 680-682, 97 S.Ct. 1401 [1417-1418, 51 L.Ed.2d 711.]

[Ibid.]
In striking this balance, the Court determined that "the warrant requirement ... is unsuited to the school environment." Id. at 340, 105 S.Ct. at 742, 83 L.Ed.2d at 733. The Court also ruled that "strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law" is not necessary. Id. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734.
Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception," Terry v. Ohio, 392 U.S. [1] at 20, 88 S.Ct. 1868, [1879, 20 L.Ed.2d 889;] second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," ibid.

[Ibid.]
T.L.O. involved an individualized suspicion that a student had been smoking in a lavatory, contrary to school rules. The Court, in reversing the New Jersey Supreme Court, see State ex rel. T.L.O., 94 N.J. 331, 463 A.2d 934 (1983), held that the search of T.L.O.'s purse for cigarettes and other evidence of smoking and the search for marijuana, once cigarette rolling papers were found, was not unreasonable.
The present case did not involve individualized suspicion and, therefore, defendants cannot comply with the following refinement by the Court of its reasonableness test:
Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.
[T.L.O. supra, 469 U.S. at 341-42, 105 S.Ct. at 742-43, 83 L.Ed.2d at 734-35.]
*375 The Court, however, in footnote eight, left open the question whether individualized suspicion was a sine qua non of the right to search. In footnote eight, the Court stated:
We do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school authorities. In other contexts, however, we have held that although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,]... the Fourth Amendment imposes no irreducible requirement of such suspicion." United States v. Martinez-Fuerte, 428 U.S. 543, 560-561, 96 S.Ct. 3074 [3084, 49 L.Ed.2d 1116] (1976). See also Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727 [18 L.Ed.2d 930] (1967). Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where "other safeguards" are available "to assure that the individual's reasonable expectation of privacy is not `subject to the discretion of the official in the field.'" Delaware v. Prouse, 440 U.S. 648, 654-655, 99 S.Ct. 1391 [59 L.Ed.2d 660] (1979) (citation omitted). Because the search of T.L.O.'s purse was based upon an individualized suspicion that she had violated school rules, see infra, [469 U.S.] at 343-347 [105 S.Ct. at 743-746] 83 L.Ed.2d, at 736-738, we need not consider the circumstances that might justify school authorities in conducting searches unsupported by individualized suspicion.
[Id. at 342 n. 8, 105 S.Ct. at 743 n. 8, 83 L.Ed.2d at 735.]
It is helpful to review briefly some cases involving searches and seizures held to be valid in the absence of individualized suspicion.
United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), involved permanent checkpoints operated by the United States Border Patrol many miles from the international border with Mexico. The issue was "whether a vehicle may be stopped at a fixed checkpoint for brief questioning of its occupants even though there is no reason to believe the particular vehicle contains illegal aliens." Id. at 545, 96 S.Ct. at 3077, 49 L.Ed.2d at 1121. The Court held that the permanent checkpoints did not violate the Fourth Amendment and that a judicial warrant authorizing a checkpoint was not required. In its analysis, the majority[3] recognized the need and effectiveness of checkpoints in deterring and arresting the flow of illegal aliens from Mexico into the United States. Against this need, the Court balanced the degree of intrusion on Fourth Amendment interests which the *376 Court described as limited, as it involved only a brief detention of travelers during which the vehicle's occupants are asked a few questions and possibly required to produce a document establishing their right to be in the United States.
The Court also emphasized that the checkpoint at which all motorists are stopped and questioned creates less concern and anxiety in the motoring public than selective, random stops and also eliminates the potential abusive exercise of discretion. The Court stated:
Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review.
[Id. at 559, 96 S.Ct. at 3083-3084, 49 L.Ed.2d at 1129.]
The Court's concern regarding "the unbridled discretion of law enforcement officials" was expressed in Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660, 672 (1979). In that case, the Court ruled that random spot checks of drivers violated the Fourth Amendment. The Court expressed its rationale when it stated:
When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations  or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered  we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has *377 insisted that the discretion of the official in the field be circumscribed, at least to some extent.

[Ibid.]
The Court, however, cautioned that its holding "does not preclude [States] from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." Id. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673-74. Cf. United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (officers on roving border patrol away from the border must have reasonable suspicion that vehicle to be stopped contained illegal aliens).
Michigan State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), involved a sobriety checkpoint at which all vehicles were stopped and their drivers briefly examined for signs of intoxication. The Court, in reversing a determination of the Court of Appeals of Michigan, held that the procedure did not violate the Fourth Amendment. It reached this conclusion by balancing the need for programs to combat drunk driving against the "slight" intrusion on the privacy interests of the motoring public. Id. at 451, 110 S.Ct. at 2486, 110 L.Ed.2d at 420-21. Responding to the lower court's reliance on the factor of effectiveness of the sobriety checkpoint in combating drunk driving, the Court observed:
The actual language from Brown v. Texas, upon which the Michigan courts based their evaluation of "effectiveness," describes the balancing factor as "the degree to which the seizure advances the public interest." 443 U.S., [47] at 51, 99 S.Ct. 2637 [2640, 61 L.Ed.2d 357.] This passage from Brown was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers. Brown's rather general reference to "the degree to which the seizure advances the public interest" was derived, as the opinion makes clear, from *378 the line of cases culminating in Martinez-Fuerte, supra. Neither Martinez-Fuerte nor Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391 [59 L.Ed.2d 660] (1979), however, the two cases cited by the Court of Appeals as providing the basis for its "effectiveness" review, see 170 Mich.App, [433] at 442, 429 N.W.2d, [180] at 183, supports the searching examination of "effectiveness" undertaken by the Michigan court.
[Id. at 453-54, 110 S.Ct. at 2486-87, 110 L.Ed.2d at 422-23.]
In United States v. Skipwith, 482 F.2d 1272 (5th Cir.1973), the Court of Appeals held that persons "who actually present themselves for boarding on an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion." Id. at 1276. The court found a substantial public necessity for the intrusion of a search in the perils created by air piracy and terrorism. The court addressed the degree of intrusion:
On the other side of the judicial scales, the intrusion which the airport search imposes on the public is not insubstantial. It is inconvenient and annoying, in some cases it may be embarrassing, and at times it can be incriminating. There are several factors, however, which make this search less offensive to the searched person than similar searches in other contexts. One such factor is the almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point. As one commentator has put it in the border search context, "individuals searched because of their membership in a morally neutral class have less cause to feel insulted...." In addition, the offensiveness of the screening process is somewhat mitigated by the fact that the person to be searched must voluntarily come to and enter the search area. He has every opportunity to avoid the procedure by not entering the boarding area. Finally, the circumstances under which the airport search is conducted make it much less likely that abuses will occur. Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public. Moreover, the airlines, which have their representatives present, have a definite and substantial interest in assuring that their passengers are not unnecessarily harassed. The officers conducting the search under these circumstances are much more likely to be solicitous of the Fourth Amendment rights of the traveling public than in more isolated, unsupervised surroundings.

[Id. at 1275-76.]
See United States v. Herzbrun, 723 F.2d 773 (11th Cir.1984) (seizure and search of hand luggage based on x-ray search at airport security checkpoint upheld); accord United States v. Wehrli, 637 F.2d 408 (5th Cir.), cert. denied, 452 U.S. 942, 101 *379 S.Ct. 3089, 69 L.Ed.2d 958 (1981); see also United States v. Albarado, 495 F.2d 799 (2d Cir.1974) (magnetometer search upheld, though subsequent frisk and search of package were unreasonable in scope).
Regarding the present case, we consider and evaluate the factors relied on in the previously cited cases to determine the reasonableness of the search of Brien Desilets' hand luggage.
In T.L.O., the Supreme Court recognized the substantial need of teachers and administrators to maintain discipline in the classroom and on school grounds. The Court also observed that breaches of school discipline in recent years often have involved drug use and violent crime. T.L.O. was written in 1985. Eight years later, we cannot report that school crime and violence have receded. Plaintiffs contend that Clearview is a suburban school system which does not have the severe crime or discipline problem most commonly associated with inner-city schools. In T.L.O., the Supreme Court anticipated and answered that contention when it recognized that close supervision of students and the enforcement of school rules is necessary even in school systems that have not experienced severe disciplinary problems. T.L.O., supra, 469 U.S. at 339, 105 S.Ct. at 741, 83 L.Ed.2d at 733.
According to Superintendent Toscano, the field trip search policy was initiated in the 1970's as a response to incidents in which students brought "contraband" on field trips. The parties stipulated that from 1978 to 1991, while the policy was in effect, hand luggage searches turned up contraband in six instances. Plaintiff points to that statistic as evidence that there is no problem at Clearview serious enough to justify the searches in the absence of individualized suspicion. The counter argument, of course, is that the search policy has been an effective deterrent. In the airport search cases, deterrence was recognized as a legitimate constitutional foundation for a universal search policy. Herzbrun, supra, 723 F.2d at 776 ("Established search procedures are more valuable for what they discourage than what they *380 discover"); Albarado, supra, 495 F.2d at 804 ("One of the prime purposes of the search, moreover, is deterrence").
Our memories are not so short that we cannot recall the rich opportunity for mischief which the field trip provides to some students. The need for close supervision in the schoolhouse is intensified on field trips where opportunities abound to elude the watchful eyes of chaperones. Administrators and teachers have a duty to protect students from the misbehavior of other students. See Titus v. Lindberg, 49 N.J. 66, 73, 228 A.2d 65 (1967). See also Jackson v. Hankinson, 51 N.J. 230, 238 A.2d 685 (1968), affirming, 94 N.J. Super. 505, 229 A.2d 267 (App.Div. 1967); Law v. Newark Bd. of Ed., 175 N.J. Super. 26, 417 A.2d 560 (App.Div. 1980); Sutphen v. Benthian, 165 N.J. Super. 79, 397 A.2d 709 (App.Div. 1979). In the context of a field trip, we add to that burden the duty to protect the general population from student mischief.
We also observe that a teacher confronted with a serious problem of misbehavior or injury in the schoolhouse readily has available to him or to her substantial resources to deal with the problem, such as other teachers and administrators, a school nurse, and quick access to police and ambulance services, if necessary. On the other hand, chaperones on a field trip are relatively isolated. See Webb v. McCullough, 828 F.2d 1151, 1157 (6th Cir.1987), in which the court recognized that "there are many more ways for a student to be injured or to transgress school rules or laws during a non-curricular field trip than during relatively orderly school hours." In Webb, the Court of Appeals held that a school administrator's search of a student's hotel room while on an extended field trip to Hawaii from Tennessee did not violate the Fourth Amendment. The court relied on TLO and the principle of in loco parentis. But cf. Kuehn v. Renton School Dist. No. 403, 103 Wash.2d 594, 694 P.2d 1078 (1985) a pre-T.L.O. case in which the court held that a search of the luggage of all students participating in a field trip was invalid in the absence of individualized suspicion.
*381 Although the Clearview board's policy focuses on interdicting possession of drugs, alcohol and weapons, we are aware that even well intentioned students, wholly lacking malignant purpose, may attempt to take inappropriate and potentially dangerous items on a field trip or extracurricular outing, if only to show-off. Items coming to mind are fancy sports knives such as hunting or scuba diving knives, a school-made rocket, see Engel v. Gosper, 71 N.J. Super. 573, 177 A.2d 595 (Law Div. 1962), a discus, see Poelker v. Macon Comnty. School Dist., 212 Ill. App.3d 312, 156 Ill.Dec. 695, 571 N.E.2d 479 (1990), appeal denied, 141 Ill.2d 559, 162 Ill.Dec. 506, 580 N.E.2d 132 (1991), a sling-shot, and, of course, fireworks, see Nicholson v. Bd. of Ed., City of New York, 43 A.D.2d 945, 351 N.Y.S.2d 731 (1974).[4] The potential is limited only by the boundaries of the fertile imaginations of children who "have a known proclivity to act impulsively without thought of the possibilities of danger. It is precisely this lack of mature judgment which makes supervision so vital." Titus v. Lindberg, supra, 49 N.J. at 75, 228 A.2d 65 (quoting Conway, J. dissenting in Ohman v. Bd. of Education, 300 N.Y. 306, 90 N.E.2d 474, 478 (1949)). See Simmons v. Beauregard Parish School Bd., 315 So.2d 883 (La. Ct. App.) (student injured in explosion of his simulated volcano), writ denied, 320 So.2d 207 (La. 1975).
The deterrent effect of the board's search policy advances the legitimate interest of the school administrators in preventing students from taking contraband, in the broadest sense of the word, on field trips. The fact that this deterrence is not perfect, because students can hide some contraband, e.g., small quantities of drugs, on their persons, does not render the search unconstitutional. See Michigan State Police v. Sitz, supra, 496 U.S. at 453-54, 110 S.Ct. at 2486-87, 110 L.Ed.2d at 422-23.
As in the permanent checkpoint in Martinez-Fuerte and in the airport searches, Clearview's students are not subject to the abusive exercise of discretion. The search policy was established *382 by the school administrators. It permits no discretion: all students participating in a field trip must submit to a search of their hand luggage. Indeed, there is less discretion in the person performing the school search than there is in the alien checkpoint or in the airport searches. Consequently, there is no stigma attached to the school search. Anxiety is eliminated by the prior warning that hand luggage will be searched, by the universality of the experience, and by the performance of the search in the open.
We are persuaded that the search was justified at its inception by the unique burdens placed on school personnel in the field trip context and that the search limited to hand luggage was reasonably related to the school's duty to provide discipline, supervision and control. In this regard, we note that the search is conducted only if the student chooses to bring hand luggage and, being forewarned, the student is able to eliminate from the hand luggage items which, though not contraband, may be embarrassing to the student if revealed.
We also reject plaintiff's contention that the search was invalid under Article I, paragraph 7 of the New Jersey Constitution. We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart. We note that in its T.L.O. opinion the New Jersey Supreme Court analyzed the search and seizure issue under the Fourth Amendment to the United States Constitution, and did not suggest that New Jersey's organic law imposed more stringent standards.
Affirmed.
NOTES
[1] The trial court also addressed plaintiff's claim that defendants had engaged in an unconstitutional censorship of certain articles submitted to the school newspaper. That issue is the subject of a separately docketed appeal, No. A-862-91T2.
[2] We have omitted the footnotes from quotations except where otherwise indicated.
[3] Justice Marshall joined with Justice Brennan in dissent.
[4] These cases did not involve field trips.