818 A.2d 361

STATE OF NEW JERSEY, PLAINTIFF,
v. HAMID WHITE, DEFENDANT.

Superior Court of New Jersey
Law Division

December 3, 2002.

*Roger J. Imhoff,* Assistant Prosecutor, for the State (*Donald C. Campolo,* Acting Essex County Prosecutor, attorney).

*William C. Strauss,* Assistant Deputy Public Defender, for the Defendant (*Yvonne Smith Segars,* Public Defender, attorney).

VENA, J.S.C.

This matter comes before the court on motion of the Defendant pursuant to Rule 3:5–7 to suppress evidence seized as a result of a warrantless search and/or seizure on January 31, 2002. Opposition was filed by the State and a hearing held on March 26, 2003. The facts offered at the hearing were substantially uncontested.

On January 31, 2002 at approximately 12:35 pm, Newark Police Officer Joseph Frost and others identified as members of the "Safe City Task Force" stopped a Taxicab to perform a "Taxi Vehicle Safety Check" at West Bigelow and Seymour Streets. No grounds specific to the vehicle stop were offered other than to state generally an "influx of acts conducted against cab drivers recently."

The behavior of the Defendant in the rear of the cab caused the police to open the rear door where a bag containing vials, which later tested positive for cocaine, was observed.

The United States Supreme Court has specifically held that before a motor vehicle stop may be made, a patrolman must have an articulable and reasonable suspicion that either the vehicle or an occupant is subject to seizure for a violation of the law. *Delaware v. Prouse,* 440 *U.S.* 648, 663, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979)(citing *Terry v. State,* 392 *U.S.* 1,30, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968)); *State v. Carpentieri,* 82 *N.J.* 546, 549, 414 *A.*2d 966 (1980) (adopting Supreme Court decision in *Prouse* ).

However, suspicionless vehicle stops may be upheld where reasonable. Reasonableness depends on a balance between public interest and an individual's right against arbitrary interference by law enforcement officers. *Brown v. Texas,* 443 *U.S.* 47, 50, 51, 99

*S.Ct.* 2637, 61 *L.Ed.*2d 357 (1979); See also *Desilets v. Clearview Reg. Bd. of Educ.*, 265 *N.J.Super.* 370, 377, 627 *A.*2d 667 (1993) (discussing *Brown* balancing factors). To determine reasonableness and the constitutionality of a seizure, a court weighs "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown*, 443 *U.S.* at 51, 99 *S.Ct.* 2637 (accord *Mich. State Police v. Sitz*, 496 *U.S.* 444, 110 *S.Ct.* 2481, 110 *L.Ed.*2d 412 (1990); *Prouse*, 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979); *but see In re Muhammad F.*, 94 *N.Y.*2d 136, 700 *N.Y.S.*2d 77, 722 *N.E.*2d 45 (1999) (holding taxicabs stops without probable cause unconstitutional)).

Specifically, suspicionless taxicab safety stops have been examined by only a few courts. Those courts which examined taxicab safety stops all employed the Brown balancing test. *U.S. v. Woodrum*, 202 *F.*3d 1, 12 (1st Cir.2000); *N.Y. v. Abad*, 98 *N.Y.*2d 12, 16, 744 *N.Y.S.*2d 353, 771 *N.E.*2d 235 (N.Y.2002); *Muhammad F.*, 94 *N.Y.*2d at 147, 700 *N.Y.S.*2d 77, 722 *N.E.*2d 45.

In *Woodrum*, Boston Police created "Operation Taxi," a program that encouraged police officers to stop taxicabs to confirm the operator's safety, especially after dark and in high-crime areas. 202 *F.*3d at 3. However, several state trial judges held that the stops made pursuant to "Operation Taxi" violated the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.*

In order to continue protecting taxicab operators, the police department launched a revised program, coined TIPS. TIPS encouraged voluntary participation in the program. TIPS required that participating owners display conspicuous bi-lingual exterior decals in the rear side windows and interior decals in the rear passenger compartment so as to clearly notify the passengers that the "vehicle may be stopped and visually inspected by the Boston Police at any time to ensure driver's safety." *Id.* at 4. Additionally, the program specified that (1) the stops should be conducted when and wherever necessary, particularly during the evening and

early morning hours; (2) attention will be given to isolated and high crime areas; (3) taxi drivers are not to be detained longer than is necessary to check on the welfare of the operator; (4) passengers in occupied taxis are to be given a brief explanation that the stop's purpose is the driver's safety; (5) a Taxi Inspection Program for Safety form shall be completed at the time of the stop. *Id.* at 4–5.

When applying the *Brown* balancing test, the *Woodrum* court examined the "obvious public concern" of preventing taxicab drivers from being robbed or murdered. *Id.* at 28. The court also weighed the taxi owner's narrow and limited consent as protection against unfettered police discretion. *Id.* at 29. Lastly, the court examined the severity of the interference with individual liberty. The court determined that TIPS imposed a modest intrusion on passenger liberty, as stops are usually brief, involve "only limited inquiries to the driver, and impose quick visual inspection of the cab's interior." *Id.* at 30. Consequently, the court ultimately found the TIPS program did not violate the Fourth Amendment. *Id.* at 9 (1st Cir.2000) (noting also Lynch, J., dissenting opinion which argued that the unfettered discretion given to police to randomly stop participating taxicabs violated individual privacy rights of passengers).

Similarly, the New York Police Department initiated Taxicab/Livery Driver Safety Program, nicknamed TRIP. *Abad*, 98 *N.Y.*2d at 16, 744 *N.Y.S.*2d 353, 771 *N.E.*2d 235. The TRIP program was instituted after the New York Court of Appeals struck down an earlier program in *Muhammad F. Id.* at 18, 744 *N.Y.S.*2d 353, 771 *N.E.*2d 235. The TRIP program permits roving patrols of plain clothes officers and unmarked cars to stop vehicles who voluntarily participate in the TRIP program. By participating in TRIP, the owner (1) agrees and (2) signs a consent form that "the police may stop the vehicle at any time in accordance TRIP's guidelines" and (3) displays conspicuous decals to that effect on the interior and exterior of the cab. *Id.* at 18, 744 *N.Y.S.*2d 353, 771 *N.E.*2d 235.

The *Abad* court affirmed that there is an undisputed "acute" public interest in preventing crime against livery cab drivers. *Id.* at 17, 744 *N.Y.S.*2d 353, 771 *N.E.*2d 235. Next, the court determined that officers' discretion was not random but significantly constrained to participating vehicles. *Id.* Importantly, the voluntariness of TRIP was compared to programs that subject all vehicles to random, suspicionless stops at the unchecked discretion of individual officers. *Prouse,* 440 *U.S.* at 659–60, 99 *S.Ct.* 1391 (holding suspicionless seizures to check licenses and registrations unreasonable given available alternatives and incremental contribution to stated purpose of highway safety). New York's TRIP program also allows drivers to withdraw from the program should the intrusiveness outweigh the intended benefits or discourage ridership among potential passengers. *Abad,* 98 *N.Y.*2d at 18, 744 *N.Y.S.*2d 353, 771 *N.E.*2d 235. Moreover, TRIP's structure and restrictions significantly reduce the intrusiveness of stops in accord with the third factor of *Brown.* Absent an independent reason to detain them, occupants are free to leave without being asked to provide identification. Additionally, TRIP requires police to complete a detailed activity log for every stop made, which allows for "post-stop judicial review" to the extent questions are raised as to the actual operation of the program. Finally, The police also maintain a registration log of all vehicles participating in the program. Thus, TRIP passed constitutional muster because it allows voluntary participation, requires written consent to the stops, conspicuously notifies passengers, and keeps detailed records regarding each search and participant in the program.

Comparatively, in *Muhammad F.,* the Court of Appeals of New York examined an earlier taxicab program, prior to TRIP. 94 *N.Y.*2d 136, 700 *N.Y.S.*2d 77, 722 *N.E.*2d 45. There, the court analyzed the warrantless, suspicionless, and random stops by applying the Brown balancing factors and concluded that they were unconstitutional. *Id.* at 145, 700 *N.Y.S.*2d 77, 722 *N.E.*2d 45. The court determined that the public has an undisputed interest in protecting taxicab drivers. Second, the court concluded that there was no evidence showing that the warrantless, suspicionless, and

random stops effectively protected taxicab drivers from harm. *Id.* at 147, 700 *N.Y.S.*2d 77, 722 *N.E.*2d 45. Third, New York failed to show that the stops were the least intrusive means available to protect drivers. *Id.* Fourth, the court held that the stops were excessive and unjustifiably intrusive. *Id.* Fifth, no warning was given to taxicab drivers or passengers. *Id.* Significantly, the facts showed officers had "standardless and unconstrained discretion" to stop taxicabs. *Id.* For example, the Police Department did not produce guidelines with "listed criteria" that "established procedures for site selection, lighting and signs; avoidance of discrimination by stopping all vehicles, or every second, third or fourth vehicle; and location of screening areas." *Id.* at 148, 700 *N.Y.S.*2d 77, 722 *N.E.*2d 45. Moreover, the officers were not even required to make a written record of stops negating the possibility of any "post-stop judicial review." *Id.* at 147, 700 *N.Y.S.*2d 77, 722 *N.E.*2d 45. Conclusively, the court held that the above-described stop was unconstitutional.

## *NEW ARK POLICE DEPARTMENT'S TAXI VEHICLE SAFETY CHECK PROGRAM*

Here, the Defendant's taxi was stopped pursuant to a routine Taxi Vehicle Safety Check Program designed to protect cab drivers from crime. The Taxi Vehicle Safety Check Program apparently originated from an Executive Order from the Commander of the Criminal Investigation Division to the Director of Taxicab Division that authorized suspicionless warrantless seizures of taxicabs for the purpose of protecting the drivers.

A suspicionless vehicle stop may be upheld as reasonable after a court balances the public interest and an individual's right against arbitrary interference by law officers. *Brown*, 443 *U.S.* at 50–51, 99 *S.Ct.* 2637 (1979); *Desilets*, 265 *N.J.Super.* at 377, 627 *A.2d* 667. Thus, this Court, first examines the gravity of public concern. Here, a warrantless seizure conducted to protect taxicab and livery drivers may well serve a compelling public interest in light of a recent trend of violence against taxicab and livery

drivers. In examining the second prong the court examines the degree that the seizure advances the public interest. No evidence of the effectiveness of conducting random suspicionless stops and/or the utility of any less intrusive alternatives has been proffered. No statistics have been offered to prove the number of taxicabs inspected in the program nor how many summons have been issued.

Third, unlike the New York program TRIP or the Massachusetts program TIPS, the Newark Police program is apparently compulsory with no opportunity for drivers or owners to enter or withdraw from the program. Thus, neither the drivers or owners of taxicabs or livery cars have given police consent to seize the cabs without reasonable suspicion. Similar to the program found unconstitutional in *Muhammad F.*, there is no evidence of exterior decals alerting police to a consenting driver. Also, apparently, no interior decals are affixed to the interior of the car alerting passengers of the safety seizure scheme. Without passenger notice or third party consent, suspicionless warrantless stops made pursuant to a taxi driver safety scheme are unconstitutional. *Abad,* 98 *N.Y.*2d at 20, 744 *N.Y.S.*2d 353, 771 *N.E.*2d 235.

The State also avers that the police caretaking and regulatory functions legitimize the officers' seizure of the Defendant and taxicab. "Police officers have a community caretaking function which, has its source in the ubiquity of the automobile and the dynamic, differential situations police officers are confronted with to promote driver safety." *State v. Cryan,* 320 *N.J.Super.* 325, 330, 727 *A.*2d 93 (1999) (citing *U.S. v. Rodriguez–Morales,* 929 *F.*2d 780, 784–86 (1st Cir.1991) (cert.denied) (1992); *State v. Martinez,* 260 *N.J.Super.* 75, 78, 615 *A.*2d 279 (App.Div. 1992) (operating vehicle abnormally justifies motor vehicle stop under community caretaking function)). Stops made pursuant to the caretaking function must be founded in articulable reasonable suspicion based on the totality of the circumstances. *Cryan,* 320 *N.J.Super.* at 330–332, 727 *A.*2d 93; *State v. Stovall,* 170 *N.J.* 346, 361, 788 *A.*2d 746 (2002) (citing *U.S. v. Cortez,* 449 *U.S.* 411, 417,

101 *S.Ct.* 690, 66 *L.Ed.*2d 621 (1981)). In fact, each of the caretaking cases which justified stopping was decided based on the abnormal operation of the vehicle indicating there may be some difficulty presented to the driver or hazards caused to others. *Cryan,* supra. at 331, 727 *A.*2d 93 (citing *State v. Washington,* 296 *N.J. Super.* 569, 687 *A.*2d 343 (App.Div.1997)); *Rodriguez–Morales,* 929 *F.*2d at 784–86; *Martinez,* 260 *N.J.Super.* at 78, 615 *A.*2d 279. Therefore, if a stop is not objectively reasonable under the community caretaking function, it is unconstitutional. *Cryan* 320 *N.J.Super.* at 331, 727 *A.*2d 93 (citing *Doheny v. Commissioner of Pub. Safety,* 368 *N.W.*2d 1, 2 (Minn.Ct.App.1985)) (holding officer's belief that motorist was lost did not justify stop); *North Dakota v. Brown,* 509 *N.W.*2d 69, 71–72 (N.D.1993) (holding stop invalid because officer failed to provide any clear reason for thinking driver needed assistance); *Washington v. DeArman,* 54 *Wash. App.* 621, 774 *P.*2d 1247, 1249–50 (*Wash. Ct.App.* 1989) (holding despite officer's belief that defendant or his motor vehicle was disabled because the vehicle remained motionless at stop sign for forty-five to sixty seconds, this belief was dispelled when the vehicle moved, and therefore the stop was unjustifiable).

The State has specifically relied upon the police officer's caretaking function to justify stopping the taxicab in which the defendant was a passenger. By doing so, the State concedes the fact that the officer had no articulable reasonable suspicion that an offense had been committed or was being committed prior to stopping and seizing the cab. Since there is no evidence of guilt other than the evidence obtained from the unlawful stop, the evidence is suppressed.

Similarly, the State's regulatory authority does not authorize warrantless, suspicionless, stops of taxicabs. In support of its position, the state offers only *State v. Bromell,* 251 *N.J.Super.* 85, 92, 596 *A.*2d 1105 (Law Div.1991)(approving warrantless administrative search of auto-body facility only after noting the statutory authority for the search, the existence of information causing the need for the inspection, and most importantly, the constitutionally

adequate regulatory substitute of the warrant requirement) and *State v. Rednor,* 203 *N.J.Super.* 503, 504–8, 497 *A.*2d 544 (App.Div. 1985) (recognizing a warrant exception with highly regulated industries where such random inspections are expected pursuant to a publically promulgated regulatory scheme).

██ Before a regulatory search can be undertaken, an administrative search warrant must be obtained. *Payton v. New York,* 445 *U.S.* 573, 586, 100 *S.Ct.* 1371, 63 *L.Ed.*2d 639 (1980); *State v. Bonaccurso,* 227 *N.J.Super.* 159, 164, 545 *A.*2d 853 (1988). However, in closely regulated industries an exception to the warrant requirement has been carved out for searches of premises pursuant to an administrative inspection scheme. *Shoemaker v. Handel,* 795 *F.*2d 1136 (3rd Cir.1986) (horse racing); *Donovan v. Dewey,* 452 *U.S.* 594, 101 *S.Ct.* 2534, 69 *L.Ed.*2d 262 (1981)(coal mines); *U.S. v. Biswell,* 406 *U.S.* 311, 92 *S.Ct.* 1593, 32 *L.Ed.*2d 87(1972) (gun selling); *Colonnade Catering Corp. v. U.S.,* 397 *U.S.* 72, 90 *S.Ct.* 774, 25 *L.Ed.*2d 60 (1970) (liquor industry); *State v. Williams,* 84 *N.J.* 217, 417 *A.*2d 1046 (1980) (Tavern industry); *State v. Rednor,* 203 *N.J.Super.* 503, 497 *A.*2d 544 (App.Div.1985) (liquor industry); *Matter of Environmental Protection Dep't.,* 177 *N.J.Super.* 304, 426 *A.*2d 534 (App.Div.1981) (wastewater treatment facility);*Bonaccurso, supra* (meat-packing industry).

██ A warrantless inspection, however, even in a pervasively regulated industry, is reasonable only when three criteria are met. *Bonaccurso,* 227 *N.J.Super.* at 165, 545 *A.*2d 853 (citing *Burger,* 482 *U.S.* at 702, 107 *S.Ct.* 2636; *State v. Turcotte,* 239 *N.J.Super.* 285, 292, 571 *A.*2d 305 (1990)). First, there must be a substantial government interest in the regulatory scheme under which the inspection is conducted. *Id.* (citations omitted). Second, the warrantless search must be necessary to further the regulatory scheme. *Bonaccurso,* 227 *N.J.Super.* at 165, 545 *A.*2d 853 (citing *Burger,* supra; *Turcotte,* supra). Third, in terms of certainty and regularity of its application, the inspection must provide a constitutionally adequate substitute for a warrant. *Bonaccurso,* 227

*N.J.Super.* at 165, 545 *A.*2d 853 (citing *Burger,* supra; *Turcotte,* supra).

Specifically, to provide a constitutionally adequate substitute, the regulatory scheme must perform the two basic functions of a warrant by: (a) advising the property owner that a search is being made pursuant to law and properly defining the scope of that search and; (b) limiting the discretion of the inspecting officer. *Bonaccurso,* 227 *N.J.Super.* at 165, 545 *A.*2d 853 (citing *Burger,* supra; *Turcotte,* supra).

If all the three criteria are met, the administrative search is reasonable and discovered evidence admissible. *Bonaccurso,* 227 *N.J.Super.* at 165, 545 *A.*2d 853 (citing *Turcotte,* supra, *Burger,* supra).

Here, suspicionless warrantless seizures are not necessary to achieve taxicab operator safety. Second, the warrantless suspicionless searches are not necessary to further the regulatory scheme. Third, the inspection fails to be a constitutionally adequate substitute for a warrant as it (1) does not advise the property owner that a search can be made pursuant to law and properly defining the scope of that search and; (2) allows virtually unfettered discretion of the inspecting officer.

The carefully tailored scheme now approved in Massachusetts and New York may well meet constitutional muster in this State as an appropriate regulatory measure. However, no such program is before this court. Much like the programs held unconstitutional in those states, the random, suspicionless stops of vehicles, without more, cannot pass constitutional muster.