803 A.2d 706 (2002)
353 N.J. Super. 600
Michael and Deborah JOYE, on behalf of themselves and their minor child, Shaun JOYE; Phil and Joan Greiner, on behalf of themselves and their minor child, Melissa Greiner; Mark and Linda Zdepski, on behalf of themselves and their minor child, Anna Zdepski, Plaintiffs-Respondents,
v.
HUNTERDON CENTRAL REGIONAL HIGH SCHOOL Board of Education and Acting Superintendent of Schools, Judith Gray, in her official capacity, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 2002.
Decided August 12, 2002.
*707 Kevin Kovacs argued the cause for appellants (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Mr. Kovacs and Rita Barone, Bedminster, on the brief).
J.C. Salyer argued the cause for respondents (Krovatin & Associates and American Civil Liberties Union of New Jersey Foundation, attorneys; Ravinder S. Bhalla, Newark, Edward Barocas, West Orange, and Mr. Salyer, on the brief).
New Jersey School Boards Association, amicus curiae, Cynthia J. Jahn, attorney; (Donna M. Kaye, Trenton, on the brief).
By Judges STERN, EICHEN and COLLESTER.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendants, Hunterdon Central Regional High School ("Hunterdon Central") and its Acting Superintendent of Schools, Judith Gray, appeal from a judgment entered on January 29, 2001, declaring the policy concerning drug and alcohol testing of students at Hunterdon Central in violation of the New Jersey Constitution and enjoining defendants from implementing what the parties both call "random" substance testing at Hunterdon Central.
The challenged policy expanded a prior testing program and was established for the 2000-2001 school year, to cover "students engaged in extracurricular activities and students with permits to park on campus." Because the proofs did not show drug use above the national norm or that the "targeted" group exceeded use by other students, the trial judge issued a preliminary injunction, and, according to defendants, "the parties agreed to the entry of a final order permanently enjoining the policy so as to permit an appeal expeditiously." The trial court held that "[t]he random drug testing [program] is an invasion of the student's right to privacy and constitutes an unreasonable search and seizure under the New Jersey Constitution." The judge noted that "[o]n numerous occasions New Jersey's courts have held that the State Constitution affords greater protections from unreasonable searches and seizures than does the Fourth Amendment of the United States Constitution," and concluded that "[i]n light of the heightened privacy rights under the New Jersey Constitution and the lack of a substantial special need requiring random suspicionless testing, the Hunterdon Central Policy cannot continue [and that] [a]bsent evidence of a special need, suspicionless drug and alcohol testing violates student[s'] rights to privacy."
Plaintiffs contend that the judge's legal analysis was correct, that "special needs" were not demonstrated and that defendants' testing policy constitutes an invasion of privacy and unreasonable search and seizure under the State Constitution. The defendants argue:
[T]he Trial Court incorrectly determined that the New Jersey Constitution affords greater protection in this area than the United States Constitution. Second, the Trial Court inappropriately clothed extracurricular activities with near constitutional protections. Third, the Trial Court also failed to recognize the diminished constitutional rights of public school students. Finally, the Trial Court's holding that random drug testing cannot proceed unless a school's drug problem exceeds the national norm and the targeted group of students uses drugs more than the general population *708 of students is bad law, bad policy and impractical.
In this case, students, with parental consent, voluntarily agree to undergo random testing as a condition precedent to participation in extracurricular activities. Accordingly, any claimed constitutional infringement has been freely waived. In the alternative, under the appropriate "special needs" balancing test the notable goal of deterring drug use certainly outweighs the minimal intrusion of a confidential urine analysis.

I.
The complaint was filed by parents of three Hunterdon Central students, Shaun Joye, Melissa Greiner and Anna Zdepski. At the time of the complaint, Joye was beginning his junior year, and Greiner and Zdepski were starting their senior year at Hunterdon Central. All three students were engaged in extracurricular activities and wished to continue to do so. All three were also seeking parking permits to drive to and from the school.
According to the certification of Lisa Brady, the principal of Hunterdon Central, there are approximately 2,500 students enrolled in grades 912, and Hunterdon Central has been vigorous in its efforts "to deter the use of illegal drugs and alcohol by students." It provides "drug and alcohol awareness programs" in classes and through student assemblies. It has also established a Student Assistance Program ("SAP") which employs full time professionals to counsel students and their families. From time to time, the school has conducted "dog sniffing sweeps" and "locker searches" in conjunction with the prosecutor's office and has implemented "suspicion-based" drug testing.
Despite this, the drug problem continued to grow, and in the 1996 to 1997 school year, thirty students were tested for drugs on "reasonable suspicion" and twenty-seven tested positive. Ms. Brady also became aware of two students snorting heroin on school premises in 1997.
According to the certification of John Brasell, Jr., the president of Hunterdon Central Regional High School Board of Education, the Board commissioned the Rocky Mountain Behavioral Science Institute, Inc. ("RMBSI") of Fort Collins, Colorado to conduct a study "to determine whether there indeed was a problem and, if so, the nature and extent of it." According to the RMBSI survey, over a third of Hunterdon Central students between grades 10 and 12 had used marijuana and over 10% had used hallucinogens; 12% of sophomores had used stimulants; 12% of juniors had used hallucinogens; and 13% of seniors had used cocaine. The survey also revealed that a substantial portion of the student body perceived that illegal drugs were readily available, including 38% of seniors who reported that heroin was readily "available." The perception by Hunterdon Central seniors of the widespread availability of heroin exceeded the national average, which was 35%.
In response, in 1997 the school board promulgated a random drug testing policy for student athletes that required consent by a parent or guardian to allow random drug testing as a condition of participation in the sport. A public meeting was held in October 1997, to discuss a comprehensive policy. David Evans, an expert on teen drug and alcohol abuse and the father of a child at Hunterdon Central, gave a presentation explaining drug testing and answered questions and concerns raised by parents. Based on Mr. Evans' suggestion, a community Task Force was established "to evaluate [the] current drug testing procedure... and present recommendations for optimization to the Board of Education...." Evans was appointed as Chair, and *709 Joan Greiner, an opponent of the drug testing and one of the plaintiffs herein, was appointed as Vice-Chair.
Evans certified that the Task Force met throughout 1998 and gathered data from the school SAP personnel and law enforcement agencies. It reviewed the substance abuse program at the school, including its ongoing suspicion-based drug testing and the random drug testing of athletes. The Task Force also "reviewed national studies on student drug abuse and received information from school administrators, coaches, the vice-principals, the school nurse and others as to the nature and extent of the drug problem at the school ...."
Mr. Evans further certified that the Task Force also obtained law enforcement data from the towns that "feed students to" Hunterdon Central. He certified that the "data included arrest reports, overdoses and other drug and alcohol induced mayhem." He states that in 1996-97, there were forty-one juveniles arrested for drug use with three deaths from heroin overdoses.
Jan Block, a Student Assistance/Substance Abuse Coordinator at the school, certified that she "observed a steady increase in the number of students using drugs and a major increase in the frequency and amount of drugs" from 1987 through the 1999-2000 school year when she retired.
A "follow-up survey" by RMBSI in the 1999-2000 school year showed that drug use by Hunterdon Central students was reduced.[1] However, the percentage of students who have used marijuana over the last twelve months among the general population (5% of ninth graders; 21% of tenth graders; 30% of eleventh graders and 33% of twelfth graders) was significant and above the levels of use by athletes (less than 5%) who were subject to the drug testing.
The manner in which defendants propose to test students was not contested, and the trial judge provided a concise synopsis:
The random drug testing was proposed to be conducted in the same manner in which it had been conducted on student athletes for the past three years. Specifically, each week the Athletic Director contacts a grade level Vice Principal and oversees the drawing from a box of ID numbers on the morning of testing. Parents are called to be informed that their child has been selected to be tested and they are given the right to attend if they so chose. The Athletic Director then contacts the appropriate grade level Vice Principal and the student's schedule is pulled to ascertain the least disruptive time for the testing. At that time, the student is contacted by the Vice Principal and informed that he or she has been selected for a random drug test. The Vice Principal then accompanies the student to the nearest Health Office where the student is interviewed by the nurse and is required to provide a urine sample. The sample is provided in a rest room with the door closed. The sample is tested for adulteration. If the test is positive, the parents are called if they are not already there. A second test based on the sample provided is then performed by Lab Corp., an outside testing laboratory. Lab Corp. conducts a gas chromatography mass spectrometry ("GC/MS") test which lists *710 the exact chemical nature of the drug. The results of that test are returned to the school within 24 hours. The second test is designed to ensure against false positives.

II.
Although all the students originally named in the complaint have graduated, the case involves a significant question of public importance involving a program the defendants still seek to implement, and we have elected to decide the issue addressed by the trial judge. See, e.g., IMO Application for Commitment of Geraghty, 68 N.J.209, 212, 343 A. 2d 737 (1975); Advance Electric Co., Inc. v. Montgomery Twp. Bd. of Ed., 351 N.J.Super. 160, 166, 797 A.2d 216 (App.Div.2002). Cf. Chandler v. Miller, 520 U.S. 305, 311, 117 S.Ct. 1295, 1300, n. 2,137 L.Ed.2d 513, 522 (1997).

III.
There is no dispute before us that the drug testing program involved in this case would not violate the federal constitution. Plaintiffs so conceded in a letter addressed to us following the decision in June of the United States Supreme Court in Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, ___ U.S. ___, 122 S.Ct. 2559, 153 L. Ed.2d 735 (2002), which held that random suspicionless drug testing of high school students who participate in extracurricular activities does not violate the Fourth Amendment to the Federal Constitution. Plaintiffs write that
[b]ecause the standard used by the [United States Supreme] Court in Earls is so inapposite to the standard required by the New Jersey Constitution's recognition of heightened privacy rights, the decision of the majority in Earls should not affect the outcome of this case. If anything, the decision in Earls highlights the need for New Jersey courts to act independently when enforcing the rights of New Jersey citizens under the State Constitution.
In Earls, Justice Thomas, writing for the majority, held that Techumseh, Oklahoma's student drug testing "[p]olicy is a reasonable means of furthering the School District's important interest in preventing and deterring drug use among its schoolchildren" and noted that there was a reduced expectation of privacy among students in a school setting. Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2569, 153 L.Ed. 2d at ___. The Court went on to note that
[s]ignificantly, this Court has previously held that "special needs" inhere in the public school context. See Vernonia, supra, at 653, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564; T.L.O., supra, at 339-340, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720. While schoolchildren do not shed their constitutional rights when they enter the schoolhouse, see Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (*1969), "Fourth Amendment rights ... are different in public schools than elsewhere; the `reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." Vernonia, supra, at 656, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564. In particular, a finding of individualized suspicion may not be necessary when a school conducts drug testing.
[Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2564-65, 153 L. Ed.2d at ___.]
The Court thus rejected a claim that a constitutionally recognized "privacy interest" was violated by the random testing of students involved in extracurricular activities. The Court then rejected a claim that the manner in which the test was *711 conducted by the Techumseh School District violated constitutional values. Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2566-67, 153 L. Ed.2d at ___. The Court found significant that the faculty monitor "waits outside the closed restroom stall for the student to produce a sample" and that the sample was given "behind a closed stall" before being sealed and sent for testing. Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2566, 153 L. Ed.2d at ___. Moreover, the results are kept confidential and "are not turned over to any law enforcement authority," nor result in academic discipline, except for placing restrictions on participation in the extracurricular activity upon testing positive a second time. Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2566-67, 153 L. Ed.2d at ___. Finally, the Court addressed the record on which the program was based and the "nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them." Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2567, 153 L. Ed.2d at ___. The Court concluded:
[T]his Court has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing. For instance, in Von Raab the Court upheld the drug testing of customs officials on a purely preventive basis, without any documented history of drug use by such officials. See 489 U.S. at 673, 109 S.Ct. 1384, 103 L.Ed.2d 685. In response to the lack of evidence relating to drug use, the Court noted generally that "drug abuse is one of the most serious problems confronting our society today," and that programs to prevent and detect drug use among customs officials could not be deemed unreasonable. Id. at 674, 489 U.S. 656,109 S.Ct. 1384, 103 L.Ed.2d 685; cf. Skinner, 489 U.S. at 607, n. 1, 109 S.Ct. 1402, 103 L.Ed.2d 639 (noting nationwide studies that identified on-the-job alcohol and drug use by railroad employees). Likewise, the need to prevent and deter the substantial harm of childhood drug use provides the necessary immediacy for a school testing policy. Indeed, it would make little sense to require a school district to wait for a substantial portion of its students to begin using drugs before it was allowed to institute a drug testing program designed to deter drug use.
Given the nationwide epidemic of drug use, and the evidence of increased drug use in Tecumseh schools, it was entirely reasonable for the School District to enact this particular drug testing policy. We reject the Court of Appeals' novel test that "any district seeking to impose a random suspicionless drug testing policy as a condition to participation in a school activity must demonstrate that there is some identifiable drug abuse problem among a sufficient number of those subject to the testing, such that testing that group of students will actually redress its drug problem." 242 F.3d at 1278. Among other problems, it would be difficult to administer such a test. As we cannot articulate a threshold level of drug use that would suffice to justify a drug testing program for schoolchildren, we refuse to fashion what would in effect be a constitutional quantum of drug use necessary to show a "drug problem."
[Earls, supra, ___ U.S. ___, ___, 122 S.Ct. at 2568, 153 L. Ed.2d at ___.]
Justice Thomas added:
We also reject respondents' argument that drug testing must presumptively be based upon an individualized reasonable suspicion of wrongdoing because such a testing regime would be less intrusive. See id. at 12-16. In this context, the Fourth Amendment does not require a finding of individualized suspicion, see *712 supra, at 2565, and we decline to impose such a requirement on schools attempting to prevent and detect drug use by students. Moreover, we question whether testing based on individualized suspicion in fact would be less intrusive. Such a regime would place an additional burden on public school teachers who are already tasked with the difficult job of maintaining order and discipline. A program of individualized suspicion might unfairly target members of unpopular groups. The fear of lawsuits resulting from such targeted searches may chill enforcement of the program, rendering it ineffective in combating drug use. See Vernonia, 515 U.S., at 663-664, 115 S.Ct. 2386, 132 L.Ed.2d 564 (offering similar reasons for why "testing based on `suspicion' of drug use would not be better, but worse"). In any case, this Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because "[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." Martinez-Fuerte, 428 U.S. at 556-557, n. 12, 96 S.Ct. 3074, 49 L.Ed.2d 1116; see also Skinner, supra, at 624, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 ("[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable").
Finally, we find that testing students who participate in extracurricular activities is a reasonably effective means of addressing the School District's legitimate concerns in preventing, deterring, and detecting drug use. While in Vernonia there might have been a closer fit between the testing of athletes and the trial court's finding that the drug problem was "fueled by the `role model' effect of athletes' drug use," such a finding is not essential to the holding. 515 U.S., at 663, 115 S.Ct. 2386, 132 L.Ed.2d 564; cf. id., at 684-685, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (O'CONNOR, J., dissenting) (questioning the extent of the drug problem, especially as applied to athletes). Vernonia did not require the school to test the group of students most likely to use drugs, but rather considered the constitutionality of the program in the context of the public school's custodial responsibilities. Evaluating the Policy in this context, we conclude that the drug testing of Tecumseh students who participate in extracurricular activities effectively serves the School District's interest in protecting the safety and health of its students.
[Id., ___ U.S. at ___, 122 S.Ct. at 2568-2569, 153 L. Ed.2d at ___.]
The program before us involves the same type of program as that involved in Earls, both with respect to the students tested and the procedure used. In addition, student drivers possessing parking permits are included in the testing, but no one argues that under the Earls test they cannot be included, particularly given the dangers inherent in driving a vehicle especially by a teenager under the influence of a dangerous substance.
A reading of the majority and dissenting opinions in Earls leaves no room for debate about the breath or scope of the United States Supreme Court's opinion or the validity of the Hunterdon Central drug testing program under the Federal Constitution.[2] That is so despite the way its program is conducted, those covered by it, *713 and whether or not there is the lack of a record to show some extraordinary or local problem at the school. Accordingly, the real issue before us, as we see it, is whether there is a basis for reaching a different result under our State Constitution.

IV.
We recognize that, despite the similar constitutional provisions involved, our Supreme Court has held that defendants accused of crime in New Jersey have greater protection under our State Constitution, N.J. Const. art. I, ¶ 7, than the Fourth Amendment of the Federal Constitution.[3]See, e.g., State v. Carty, 170 N.J. 632, 639, 790 A.2d 903 (2002) (consent searches); State v. Cooke, 163 N.J. 657, 666-67, 751 A.2d 92 (2000), and State v. Pierce, 136 N.J. 184, 209, 642 A.2d 947 (1994) (automobile searches); State v. Novembrino, 105 N.J. 95, 145, 519 A.2d 820 (1987) (good faith exception to the warrant requirement); State v. Alston, 88 N.J. 211, 225-26, 440 A.2d 1311 (1981) (standing); see also State v. Hempele, 120 N.J. 182, 196-97, 576 A.2d 793 (1990); State v. Williams, 93 N.J. 39, 70 n. 19, 459 A.2d 641 (1983); State v. Hunt, 91 N.J. 338, 358-72, 450 A.2d 952 (1982) (Handler, J. concurring); Marie L. Garibaldi, REMARK: Conference on the Rehnquist Court: The Rehnquist Court and State Constitutional Law, 34 Tulsa L.J. 67, 83 (1998) (suggesting the need not to "expand federal constitutional rights under an identical state constitutional provision"); Dennis J. Braithwaite, An Analysis of the `Divergence Factors': A Misguided Approach to Search and Seizure Jurisprudence Under the New Jersey Constitution, 33 Rutgers L.J. 1 (2001) (urging primary resort to interpretation of State Constitution instead of considering whether there is a basis on which to divert from the federal approach). However, we are not dealing with a criminal matter or a traditional search and seizure issue resulting in suppression of evidence obtained for use in a criminal trial. The fact of the matter is that there was no epidemic of controlled dangerous substances of the type about which our society is now concerned at the time that the Fourth Amendment or the forerunner of our Article I, par. 7 was adopted. See N.J. Const. of 1844, art. 1, ¶ 6. Therefore, while our Article I, par. 7 was adopted before the Fourth Amendment was made applicable to the states through the Fourteenth Amendment,[4] and although there is authority for the view that New Jersey courts should look to our Constitution as the organic law of this State (unless inconsistent with the minimum protection of the Federal Constitution), see Braithwaite, supra, at 27; see also Garibaldi, supra,[5] we see nothing in *714 the history or background of the State Constitution to warrant a different interpretation on this question, at least when it comes to the legitimate expectation of privacy among school children. To the contrary, the courts of New Jersey, to date, seem to follow the federal Supreme Court when dealing with issues of drug testing. See N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 546-49, 701 A.2d 1243 (1997) (adopting federal "special needs" test under State Constitution) and 556-65 (upholding random testing based on federal standard); see also International Fed'n of Prof'l & Technical Eng'rs, Local 194A v. Burlington County Bridge Comm'n, 240 N.J.Super. 9, 24, 572 A.2d 204 (App.Div.), certif. denied, 122 N.J. 183, 584 A.2d 244 (1990).[6] In fact, in Desilets v. Clearview Regional Bd. of Ed., 265 N.J.Super. 370, 382, 627 A.2d 667 (App. Div.1993), regarding the search of a student's luggage before a field trip, we noted that our Supreme Court "did not suggest that New Jersey's organic law imposed more stringent standards," and in Local 304, supra, 151 N.J. at 548-60, 701 A.2d 1243, our Supreme Court looked to the Federal Constitution and United States Supreme Court opinions, and utilized the "special needs" balancing approach for evaluating reasonableness that was discussed by Justice Thomas in Earls.
As our Courts have said previously, the Fourth Amendment's exclusionary rule was developed to deter "insolence in office," see, e.g., Tartaglia v. Paine Webber, Inc., 350 N.J.Super. 142, 148, 794 A.2d 816 (App.Div.2002), and on that premise we find it difficult to develop a separate path of rights when officers of the State follow what has been promulgated as valid by the United States Supreme Court. Thus, in the absence of any support in the history, language or intent of our Constitutional drafters, we find no basis for concluding that the State Constitution warrants a different approach than that taken by the United States Supreme Court with respect to the question of drug testing in the public schools under the Fourth Amendment.

V.
Accordingly, we reverse the judgment of the Law Division and remand the matter for further proceedings in light of the decision under review and our disposition. We note, however, that, despite the *715 preference of courts to avoid deciding constitutional issues, other contentions raised by plaintiffs were not directly addressed. Among other things, plaintiffs asserted that the Hunterdon Central drug testing policy violates the common law, N.J.S.A. 18A:40A-12 and State regulations governing the issue, and that the Board exceeded its "lawful authority" in promulgating the drug testing policy under review. In his opinion, the trial court wrote:

N.J.S.A. 18A:40A-1 et seq. in conjunction with N.J.A.C. 6:29-6 et seq. establishes procedures for implementation of school programs to prevent and treat substance abuse. Specifically, N.J.S.A. 18A:40A-10 provides that each local board of education must "establish a comprehensive substance abuse intervention, prevention and treatment referral program" in the schools of its district. Neither the statutory framework nor the adopted rules and regulations passed to effectuate the purposes of the statute limit the kinds of programs a school district may employ to combat drug abuse. Rather N.J.A.C. 6:29-6.3(c) provides a list of alcohol and drug policies that is non-inclusive. That section specifically states, "Alcohol and other drug policies of district boards of education shall include, but not be limited to, the following components:...." (Emphasis added.)
Further, in an unpublished decision relied upon by the plaintiffs in their brief to establish that Hunterdon Central's drug testing program is unconstitutional, the issue of preemption was specifically rejected by the court. Wilson v. Ridgefield Park Board of Education, No. BER-L-7984-97 (Law Div. Oct. 28, 1997). In that case, the plaintiffs also argued that N.J.S.A. 18A:40A-1 preempted the school's random drug testing program. The court held that the statute did not preempt the drug testing program because the Legislature gave local school boards the authority to "create and enforce substance abuse policies." The court went on to hold that the Ridgefield Park policy was within the scheme of the legislation. Id. at 9-11. Accordingly, there is little precedent to support the plaintiffs' arguments that the Legislature has preempted the field.[7]
Because the preliminary injunction was converted into a permanent injunction without further proceedings, and the briefs on the appeal to us develop only the constitutional issues, we do not pass upon the power of a local Board of Education to develop its own program without either legislative authority or the establishment of statewide standards. Rather, we remand to permit plaintiffs to proceed on any ground not reached by the trial judge. The trial court should also consider inviting the Attorney General to participate in deciding whether a local Board of Education has the authority to implement drug testing in the absence of legislation permitting same or statewide standards promulgated by the Legislature or the Department of Education. We merely hold that the Hunterdon Central school board's drug testing program is not unconstitutional, and remand for further proceedings consistent with this opinion.
EICHEN, J.A.D., dissenting.
I respectfully dissent and would affirm the late Judge Guterl's order granting a *716 permanent injunction[1] enjoining Hunterdon Central High School Board of Education from continuing its program of random drug testing essentially for the reasons given by Judge Guterl in his well-reasoned, thoughtful, and comprehensive single-spaced, ten-page decision issued on October 18, 2000, which was based solely on the New Jersey State Constitution. I agree with Judge Guterl that all of the targeted students had an undiminished privacy expectation in their excretory functions and that in the absence of any showing of a particularized special need for the testing, Hunterdon's random drug testing program is unreasonable and therefore violates Article I, Paragraph 7 of the New Jersey Constitution.
The majority believes that it is bound by Board of Education, Independent School District No. 92 of Pottawatomie County v. Earls, ___ U.S. ___, 122 S.Ct. 2559, 153 L. Ed.2d 735 (2002), to decide this case under the Fourth Amendment of the United States Constitution. The majority perceives nothing in the history or background of the State Constitution that would allow our courts to interpret the constitutionality of the random drug testing program differently from that of the United States Supreme Court under the Fourth Amendment. The majority also feels constrained by the fact that the issue does not arise in the context of a criminal case involving traditional search and seizure issues, but instead arises in the civil or administrative context, in an area where the expectation of privacy is already diminished because the rights affected are those of school children.
I believe the majority's view is too restrictive and would rely on the inherent authority of our Supreme Court that encourages judges to find greater protection where the search and seizure at issue is clearly unreasonable as it is here. For purposes of this opinion, I incorporate the recitation of the factual background set forth by Judge Guterl in his written decision.
Hunterdon Central Regional High School Board of Education is responsible for the operation of Hunterdon Central High School under the immediate supervision of the Acting Superintendent of Schools, Judith Gray. Hunterdon Central High School is located on Route 31 in Flemington, New Jersey, and provides secondary education to approximately 2,500 students enrolled in grades 9-12. Since 1987 Hunterdon Central has been actively involved in efforts to deter student use of illegal drugs and alcohol as well as counseling and assisting students who have become victims of drugs and alcohol abuse. Hunterdon Central also provides anti-drug awareness programs in classes and through student assemblies, has established a program for professional counseling of students and their families, has from time to time cooperated with the Hunterdon County Prosecutor's Office in the conduct of searches aided by drug sniffing dogs and has implemented suspicionbased drug testing.
Notwithstanding those efforts, there was a perception by school authorities in 1995 that the use of illegal drugs and alcohol by Hunterdon Central students remained a significant problem which initially lead [sic] to the administration of the American Drug and Alcohol Survey [2] to the school population and, thereafter, *717 to the establishment of a program of random drug testing for athletes. That program has been conducted without prior challenge for the last three years, during which time Hunterdon Central has continued to examine the subject of drug abuse among its students. The results of those continued studies have recently motivated Hunterdon Central to expand the random drug testing program to include all students involved in extra-curricular activities or authorized to park an automobile on school property. Hunterdon Central does not contend that any of its studies have shown that the students singled out for random testing are more likely than other students to be abusing drugs.[3] (Emphasis added)
In State v. Hempele, 120 N.J. 182, 196-97, 576 A.2d 793 (1990), our Supreme Court explained our responsibility as judges to determine the rights of our citizens independently under our own constitution when confronted with a decision under the Fourth Amendment that detracts from our strong tradition of protecting privacy rights against unreasonable searches and seizures:
In interpreting the New Jersey Constitution, we look for direction to the United States Supreme Court, whose opinions can provide "valuable sources of wisdom for us." State v. Hunt, 91 N.J. 338, 355, 450 A.2d 952 (1982) (Pashman, J., concurring). But although that Court may be a polestar that guides us as we navigate the New Jersey Constitution, we bear ultimate responsibility for the safe passage of our ship. Our eyes must not be so fixed on that star that we risk the welfare of our passengers on the shoals of constitutional doctrine. In interpreting the New Jersey Constitution, we must look in front of us as well as above us.
For most of our country's history, the primary source of protection of individual rights has been state constitutions, not the federal Bill of Rights. See Abrahamson, Reincarnation of State Courts, 56 Sw.L.J. 951 (1981). The genius of federalism is that the fundamental rights of citizens are protected not only by the United States Constitution but also by the laws of each of the states. The system may be untidy on occasion, but that untidiness invests it with "a vibrant diversity." Pollock, Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts, 63 Tex. L.Rev. 977, 979 (1985). "As tempting as it may be to harmonize results under the state and federal constitutions, federalism contemplated that state courts may grant greater protection to individual rights if they choose." Id. at 980.
When the United States Constitution affords our citizens less protection than does the New Jersey Constitution, we have not merely the authority to give full effect to the State protection, we *718 have the duty to do so. Every judicial officer in New Jersey takes an oath to "support the Constitution of this State...." N.J.S.A. 41:2A-6. Bound to fulfill our covenant with the people of New Jersey, we must "respectfully part company" with the Supreme Court when we find that it has provided our citizens with "inadequate protection against unreasonable searches and seizures...." State v. Alston, 88 N.J. 211, 226, 440 A.2d 1311 (1981). In so doing, we manifest no disrespect for the nation's highest court but merely honor our "obligation to uphold [our] own constitution." State v. Lund, 119 N.J. 35, 38, 573 A.2d 1376, (1990) (Pollock, J., concurring).
Cognizant of the diversity of laws, customs, and mores within its jurisdiction, the United States Supreme Court is necessarily "hesitant to impose on a national level far-reaching constitutional rules binding on each and every state." Hunt, supra, 91 N.J. at 358, 450 A.2d 952 (Pashman, J., concurring). That Court establishes no more than the floor of constitutional protection. State v. Gilmore, 103 N.J. 508, 524, 511 A.2d 1150 (1986).
[Hempele, supra, 120 N.J. at 196-97, 576 A.2d 793 (parallel citations omitted); cf Hon Dennis J. Braithwaite, An Analysis of the "Divergence Factors": A Misguided Approach to Search and Seizure Jurisprudence Under the New Jersey Constitution, 33 Rutgers L.J. 1, 23-26 (2002).]
While Hempele is of course a search and seizure criminal case, its precepts deal broadly with the power of our courts to reach a different conclusion under the State Constitution where, as here, a governmental authority intrudes impermissibly into areas affecting personal liberty, whether that authority be the police or a public official with parens patrie responsibility. This should be the case irrespective of the context in which the case arises so long as the issue involves a claim of illegal search and seizure that threatens our cherished privacy rights under our State Constitution.
In my view, there is nothing that our Supreme Court stated in N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 701 A.2d 1243 (1997), that suggests that, because the Court employed the so-called federal "special needs" analytical framework to decide whether a random drug testing program passed constitutional muster, that the decision limits our courts' inherent authority to decide a case brought under the New Jersey Constitution differently from that of the United States Supreme Court under the Fourth Amendment.[4]
"Special needs" in the context of student searches by school officials has its roots in New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L. Ed.2d 720 (1985), where the United States Supreme Court held for the first time that the Fourth Amendment's customary probable cause standard should not apply in a school setting. Instead, the Court announced a "reasonableness *719 standard" which it believed would "ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." T.L.O., supra, 469 U.S. at 341-42, 105 S.Ct. at 733, 83 L. Ed.2d at 734-35. The phrase "special needs" was introduced by Justice Blackmun in his concurring opinion in T.L.O. because of his concerns about rejecting the probable cause standard solely because it was impracticable to obtain a warrant in the school environment. T.L.O., supra, 469 U.S. at 351, 105 S.Ct. at 733, 83 L. Ed.2d at 741 (Blackmun, J., concurring) ("Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement make the warrant and probable cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the framers").
Despite the lessened expectation of privacy afforded school children under the United States Constitution, New Jersey has a long tradition requiring some quantum of individualized suspicion as a prerequisite to a constitutional search and seizure. See State v. Smith, 134 N.J. 599, 616, 637 A.2d 158 (1994). I believe that the principle of "individualized suspicion" has been transmuted into the "special needs" requirement adopted by our Supreme Court in N.J. Transit, supra, and that that requirement must be met to justify the governmental purpose of initiating random drug testing programs in this state. See N.J. Transit, supra, 151 N.J. at 531, 701 A.2d 1243.
The United States Supreme Court employed the phrase "special needs" after T.L.O. in Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653, 115 S.Ct. 2386, 2391, 132 L. Ed.2d 564, 574 (1995). There, the Court used the concept in determining to uphold random drug testing of athletes by an Oregon school district. However, in Vernonia, a "special need" was found on the facts presented due solely to "an alarming situation": "a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion ... fueled by alcohol and drug abuse as well as the student[s'] misperceptions about the drug culture." See Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2575, 153 L. Ed.2d at ___ (Ginsburg, J., dissenting opinion) (quoting Vernonia, supra, 515 U.S. at 649, 115 S.Ct. at 2388, 132 L. Ed.2d at 572) (internal quotation marks omitted). In upholding the policy of random drug testing of athletes as "reasonable," in Vernonia, the United States Supreme Court found, on the facts presented, an "immediate crisis" in the school which impacted the teachers' custodial responsibilities, thus creating a "`substantial need of teachers and administrators for freedom to maintain order in the schools.'" Vernonia, supra, 515 U.S. at 653, 115 S.Ct. at 2390, 132 L. Ed.2d at 574 (quoting T.L.O., supra, 469 U.S. at 341, 105 S.Ct. at 742, 83 L. Ed.2d at 734). Accordingly, the Court found "the severity of the need" justified the random drug testing of athletes in light of "the decreased expectation of privacy" of the student athletes and "the relative unobtrusiveness of the search." Vernonia, supra, 515 U.S. at 657, 115 S.Ct. at 2396, 132 L. Ed.2d at 577.
Thereafter, in Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137L.Ed.2d 513 (1997), the United States Supreme Court found unconstitutional a Georgia policy requiring certain candidates for public office to submit to drug testing. There, Justice Ginsburg, writing for an eight-member majority, explained that to successfully make the case that a "special need" exists, the government must demonstrate a "concrete danger demanding departure from the Fourth Amendment's main rule." Chandler, supra, 520 U.S. at 319, 117 S.Ct. *720 at 1295, 137 L.Ed.2d at 526 (emphasis added).
Despite those precedents, in a five-four decision delivered by Justice Thomas, the United States Supreme Court in Earls interpreted the "special needs" requirement as satisfied without a showing of the severity of the need in the particular school based solely on the "nationwide epidemic of drug use" among the student population. Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2568, 153 L. Ed.2d at ___. The Court concluded that the need to prevent and deter students from taking drugs, irrespective of the level of drug problem in the targeted group was a special need. Writing for the Court, Justice Thomas stated that the difference in the levels of expectation of privacy in Vernonia (athletic extra-curricular activities) and Earls (non-athletic extra-curricular activities) was "not essential" to the Court's decision in Vernonia because that decision depended on "the school's custodial responsibility and authority" not on the diminished expectation of privacy of athletes. Ibid. According to the majority, the intrusiveness is the same irrespective of the nature of the student activities.
In an insightful dissenting opinion, Justice Ginsburg, joined by Justices Stevens, O'Connor and Souter, criticized the majority's approval of the program in the absence of any demonstrated "special need... [to maintain] ... swift and informal disciplinary procedures ... [and] order in the schools." Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2565, 153 L. Ed.2d at ___ (Ginsburg, J., dissenting) (quoting Vernonia, 515 U.S. at 653, 115 S.Ct. at 2386, 132 L. Ed.2d at 574) (internal quotation marks omitted). Justice Ginsburg explained that in Vernonia the "Court concluded that a public school district facing a disruptive and explosive drug abuse problem sparked by members of its athletic teams had `special needs' that justified suspicionless testing of district athletes as a condition of their athletic participation." Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2572, 153 L. Ed.2d at ___ (Ginsburg, J., dissenting). But she also stated that Vernonia "cannot be read to endorse invasive and suspicionless drug testing of all students." Ibid.
The facts in Earls and the instant case are essentially the same: that is, there was no "immediate crisis," in either case and, therefore, no need for the immediate exercise of the "school's custodial responsibility and authority" justifying intrusion into the students' personal privacy; there was only a generalized showing that the entire student body's involvement with drugs and alcohol was basically comparable to that of the national average. Nonetheless,the Earls Court decided that it was acceptable to suspend our children's rights in the name of waging war on drugs. We should not follow this unprecedented lead.
In her dissent, Justice Ginsburg explains the flaw in the majority's view in Earls. Basically, she maintains that the anti-drug message and "the desire to augment communication of this message [should] not trump the right of persons even of children within the schoolhouse gateto be "secure in their persons ... against unreasonable searches and seizures." She emphasizes the importance of teaching students by example, distinguishing the "custodial" responsibility from the "tutelary" responsibility of teachers for their students. Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2577, 153 L. Ed.2d at ___ (Ginsburg, J., dissenting). Her argument is powerful and has persuaded me that the New Jersey Constitution must be interpreted to afford greater rights to students than the Fourth Amendment in these circumstances where no crisis exists and no safety concerns have been demonstrated.
*721 This is what Justice Ginsburg stated:
In Chandler, the Court referred to a pathmarking dissenting opinion in which Justice Brandeis recognized the importance of teaching by example: Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. That wisdom should guide decision-makers in the instant case: The government is nowhere more a teacher than when it runs a public school.
It is a sad irony that the petitioning School District seeks to justify its edict here by trumpeting the schools' custodial and tutelary responsibility for children. In regulating an athletic program or endeavoring to combat an exploding drug epidemic, a school's custodial obligations may permit searches that would otherwise unacceptably abridge students' rights. When custodial duties are not ascendant, however, schools' tutelary obligations to their students require them to "teach by example" by avoiding symbolic measures that diminish constitutional protections. That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

[Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2577, 153 L. Ed.2d at ___ (Ginsburg, J., dissenting) (emphasis added) (internal quotations and citations omitted).]
For the reasons stated herein, I would adopt Justice Ginsburg's analysis in Earls as New Jersey's constitutional law in the circumstances of this case and affirm the trial court's order declaring Hunterdon Central Board of Education's random drug testing program unconstitutional under Article I, Paragraph 7 of the New Jersey Constitution.
NOTES
[1] Brady certified that "[t]he clear perception was that drug use among athletes had declined significantly because of the possibility of being tested" and that one student explained that the testing "eased the peer pressure by giving student athletes a reason not to participate in use of alcohol and drugs."
[2] Justice Breyer wrote a separate concurring opinion but joined the majority opinion. Justices O'Connor and Ginsburg wrote separate dissenting opinions.
[3] The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Article 1, paragraph 7 reads:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.
[4] Indeed, Article I, par. 7 was needed to provide Fourth Amendment protections because the latter was not then applicable to the states. See also Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); State of New Jersey Constitutional Convention of 1947, Vol. 1 at 598-608.
[5] Both Justice Garibaldi and Judge Braithwaite consider the New Jersey cases and standards. Justice Garibaldi concludes:

I recognize that "state constitutional law plays a vital role in the federalist system." Nonetheless, to me, the New Jersey criteria approach, which gives slight deference to the United States Constitution, best achieves the appropriate balance for determining whether a state constitution provides greater protection of individual rights than a similar federal constitutional provision. Requiring a state court to explain its departure from the interpretation of an identically worded federal constitutional provision focuses the court's attention on reconciling seemingly analogous provisions of state and federal constitutions. Unless the state court can show from an examination of the textual language of the two constitutional provisions, the legislative history of the state constitution, or the state's history and tradition that the matter is of particular state interest or concern, it should not expand federal constitutional rights under an identical state constitutional provision. Those cases where there is a discernible reason to interpret identical federal and state provisions differently will be limited.
[34 Tulsa L.J. at 82-83.]
[6] While plaintiffs also point to N.J. Const. art. 1, ¶ 1 in support of an independent right of privacy, there is no suggestion that our Supreme Court would apply that provision to void the drug testing of students involved in extracurricular activities any more than the United States Supreme Court has done so under the Ninth Amendment. See, e.g., Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 95-96, 609 A.2d 11 (1992); Right to Choose v. Byrne, 91 N.J. 287, 450 A.2d 925 (1982).
[7] The trial judge also said "[t]here is also an existing statutory scheme which provides substantial grounds for school officials to test any individual student whom they reasonably believe is under the influence of illegal drugs or alcohol," citing N.J.S.A. 18A:40A-12. See Odenheim v. Carlstadt-East Rutherford Regional School Dist., 211 N.J.Super. 54, 510 A.2d 709 (Ch.Div.1985).
[1] We reviewed this case on the trial court's grant of a permanent injunction, treating the matter as a grant of summary judgment by consent of the parties.
[2] The survey of students who "have ever tried a drug" showed that Hunterdon's percentages are, in most instances, less than the national average, and where they are not the percentages are not so diverse.
[3] The Hunterdon drug testing program is similar to the program in Earls, supra. Hence, in the words of dissenting Justice Ginsburg, it is not just "[un]reasonable," but "capricious, even perverse" for it "targets for testing a student population least likely to be at risk from illicit drugs and their damaging effects." Earls, supra, ___ U.S. at ___, 122 S.Ct. at 2572, 153 L. Ed.2d at ___ (Ginsburg, J., dissenting). As for the testing of the athletes, there has been no showing of any special drug abuse problems in this student population to justify random drug testing of them. Cf. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L. Ed.2d 564 (1995).
[4] To the extent Desilets v. Clearview Bd. of Educ., 265 N.J.Super. 370, 627 A.2d 667 (App. Div.1993), concludes otherwise, I disagree with it. The fact that our Supreme Court analyzed the search and seizure issue under the Fourth Amendment in New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L. Ed.2d 720 (1985), is not dispositive of the question whether our constitution or even our common law would protect against the search and seizure in this random drug testing case as there is no indication the T.L.O. Court was even called upon to address the issue there under our constitution. Moreover, Desilets was decided before N.J. Transit applied the "special need" analytical framework to the issue.